that will be orally argued, and we call the first case, number 21-60889, Shrimpers and Fishermen of the RGV, et al. v. United States Army Corps of Engineers, et al. Mr. Goselin. Good morning. Good morning, Your Honors. My name is Tom Goselin, and I'm appearing today on behalf of the petitioners. I've reserved five minutes of my time for rebuttal. Right. In September 2021, the Army Corps issued a Clean Water Act Section 404 permit, allowing construction of an LNG export terminal and pipeline system. I'm going to preempt the question that Judge King is about to ask and ask you to speak up. Yeah. Yes, Your Honor. Sorry about that. No problem. The export terminal would be located in the very southeast corner of the state of Texas, near Brownsville, right on the Gulf of Mexico. The pipeline system would consist of two parallel pipelines that would run north up the Gulf Coast, terminating at the Agua Dulce gas hub, which is just south of Corpus Christi, Texas. The Army Corps acted unlawfully in issuing that permit. In response, we brought three claims. One of those claims concerned the terminal system, where the Army Corps failed to clearly demonstrate that it permitted the least The other two claims concern the pipeline system, where the Army Corps failed to justify not requiring compensatory mitigation for nearly 120 acres of impacts to wetlands caused by construction of the pipeline system. And the other claim, the Army Corps failed to clearly demonstrate that it permitted the least environmentally damaging practical alternative for the pipeline system. If it's okay with the court, I'm going to argue those first two claims today, and I will discuss the second pipeline claim at the end, if I have time. Counsel, before we do that, where are we in terms of, I understand FERC has to also give its approval. Is that something that comes last, or why are we, why would we decide this case now when we don't know if FERC is going to approve? Is that an issue in this case? In other words, are we kind of putting the cart before the horse? No, Your Honor, that's not an issue in this case. This project has live FERC approvals. They have been remanded by the D.C. Circuit to reconsider issues that do not come up in this case, but this case is live, and we are not putting the cart before the horse here. What if FERC doesn't approve or doesn't, well, okay, I understand. Go ahead, Your Honor. FERC approved the one on the other side of the river, right? The one that I wrote, did an opinion in? That, and that simply died. Yes, Your Honor. Why did it die? That was the Inova project, and the company announced, I think because of a lack of investment, the company announced that they were not going to go forward with the project. Oh, but it was, they're the ones that decided that. Yes, Your Honor. Okay. It wasn't your fault. Wasn't my fault. It was not your fault, Your Honor. Wasn't even the government's fault. Praise God. Okay. Under 40 CFR 23010A, the Army Corps can only permit the least environmentally damaging practicable alternative. LEDPA, right? LEDPA. You say LEDPA, that's what you mean? Yes, Your Honor. That means that the Army Corps has to ensure the project avoids impacting wetlands and special aquatic sites to the greatest extent practicable. And to do that, the regulation set up a two-pronged presumption that can only be rebutted with a clear demonstration. Alternatives that would avoid impacting special aquatic sites and wetlands are presumed to be practicable and environmentally beneficial. And at the terminal site, the Army Corps failed to rebut either of those two presumptions and therefore did not permit the LEDPA for the terminal site. I'm going to discuss one of the practical alternatives here. There's a very helpful map on page 41 of our brief. Your Honor has it right there. So if you shifted trains three through, as you can see on the east side, there's a significant amount of wetlands and special aquatic sites, support infrastructure and administrative buildings. As you move along to the west side, there's a row of liquefaction trains and ground flares. At the end of that row is an empty space labeled equipment storage lay down and preservation area. That's not in wetlands. That's about 20 acres of empty space. The ground flare sits on a salt flat, which is a kind of special aquatic site that is protected by the Clean Water Act. Can you just, what are ground flares? I'm just curious. I think I know what trains are, but what are ground flares? So when excess gas needs to be released from the system, they go up through the ground flares where it's ignited. Okay, thank you. So if we shifted trains three through five to the west and the ground flares, so that train five sits in that empty space at the end of the row, and the empty space is then shifted to where the ground flares currently reside, we would avoid five acres of that salt flat. And the Army Corps agrees with us that we would indeed avoid those five acres, but it rejected the alternative anyways, giving two insufficient reasons. First, the Army Corps claims that that salt flat would be impaired to some unknown degree even if they were avoided. But that argument doesn't stand up because the Army Corps has to begin with the presumption that avoiding the special aquatic site is better than not avoiding the special aquatic site. And to rebut that presumption, the Army Corps needs to provide clear, specific evidence showing that that would indeed not be environmentally beneficial. And here the Army Corps, by simply saying this is going to be somewhat impaired to an unknown degree, has not gotten over to that clear demonstration rebutting that presumption. The Army Corps also claims that staging construction equipment and drying dredged materials would need to occur in that empty space at the end of the row. But the Army Corps, FERC, and the developers have all already agreed that staging and drying dredged materials can occur at the end of the row during construction of the project. And then at the end of the construction sequence, a liquefaction train can be constructed in that space. They've all determined that that's a practical use of that space and that staging and drying dredged materials is not incompatible with eventually constructing a liquefaction train in that space. And so here the Army Corps has not rebutted either of those, either the practicability presumption or the environmentally beneficial presumption. And therefore, the Army Corps has not permitted the LEDPA with respect to the terminal site. I'm now going to move on to our compensatory mitigation claim, unless your honors have any more questions about that. The salt flat point, it goes to, so I know there's two prongs to this. The staging equipment drying in the empty space, that goes to the practicability of the alternative. Is that right? Staging goes to practicability. Okay, that goes to practicability. What is the salt flat? You're disagreeing with the Corps on how... Whether this alternative is environmentally beneficial. That's the environmental, I got it. Yes. Okay, thank you. So under 40 CFR 23093, the Army Corps is required to determine and require appropriate compensatory mitigation for the unavoided and un-minimized impacts caused by the projects that it permits. But here the Army Corps did not require appropriate compensatory mitigation for nearly 120 acres of impacts to wetlands. But claiming that those impacts are temporary. But the Army Corps actually agrees with us that there are no wholesale exceptions or carve-outs for even temporary impacts under its compensatory mitigation regime. And instead of an exception, the Army Corps actually has a framework for evaluating compensatory mitigation for temporary impacts. And it claims to have applied it here, albeit our position arbitrarily. The Army Corps, on a case-by-case basis, is supposed to determine, first, what constitutes a temporary impact for a given project, considering the specific circumstances of the project. Second, which impacts of the project count under that definition. And of course, if an impact does not count under that definition, it would be mitigated like any other impact associated with the project. And third, the appropriate level of compensatory mitigation to offset the losses from those temporary impacts. Here the Army Corps failed at all three levels of that analysis and thus acted arbitrarily. First, the Army Corps did not make a case-by-case determination with respect to what constitutes a temporary impact for this project. The Army Corps, I will concede, did explain how it usually defines a temporary impact. And our position is that what they call their usual definition is itself arbitrary because it avoids considering many of the different impacts that occur to wetlands. But regardless of that, a typical practice or a usual definition, of course, is not a definition tailored to this particular project or these particular impacts. Second, the Army Corps failed to quantify the duration of any of these impacts. Instead of quantifying the duration for these impacts, the Army Corps focused almost exclusively on Special Condition 7, which places a three-month limit on the amount of time that materials excavated from the pipeline trench can be side-cast into the wetlands next to the trench. The Army Corps would have us believe that that three-month period, that Special Condition 7 period, is essentially the totality of impacts caused to these wetlands by construction. But that is simply not the case and that is not supported by the record. Instead, impacts are going to begin far before trench excavation. Impacts are going to begin when heavy machinery goes through the wetlands, clear-cutting the in preparation for pipe installation, and so on and so forth. There are several special site preparation activities that we've laid out in our opening brief. Those impacts, which are certainly impacts because clearing the vegetation means the wetland can't be used as habitat anymore, grading the wetland impacts the hydrology of the site and its ability to function. Those impacts are not quantified by the Army Corps. And there are no special conditions in the permit that limit the amount of time that those activities can take place during. And then impacts are going to continue far after the three-month Special Condition 7 period. At the end of that three-month period, the developers are going to take up all that material that's been side-cast into the wetlands. They're going to turn it back into the pipeline trench to bury the pipe. Once that occurs, the wetland vegetation that was there, which is providing those habitat functions, is not going to magically reappear overnight. It's going to take time to revegetate. According to the EIS, it's going to take one to three years for that to revegetate. Now, the Army Corps implicitly disagrees with that EIS figure, but doesn't explicitly disagree with it and doesn't explain why it disagrees with it or why the Army Corps would be correct relative to what the EIS says. And so under this EIS timeline, in the best-case scenario for the impacts of these wetlands, we're looking at over a year of wetlands impacts, which is outside the one-year boundary that the Army Corps suggests in its decision memo and that EPA suggests in its comment to this. Now, that's the best-case scenario. The worst-case scenario under the one-to-three-year revegetation timeline is that revegetation does not complete by the time construction of Pipeline 2 commences, which would be 18 months after the completion of construction of Pipeline 1. Pipeline 2 would then go through these same areas where revegetation is not complete or perhaps has not begun, reimpacts those areas the same way that they were impacted for Pipeline 2. So we're looking at several years of uninterrupted impacts far outside the bounds of temporariness. And the Army Corps doesn't explain why the scenario it suggests in its decision memo is more likely than the scenario that I just suggested. To what extent should we wait? You just mentioned the worst-case scenario. To what extent should we wait the various scenarios? Because, of course, there are other vexations that we can't even anticipate, such as weather interruptions or storms or what have you. How much should we wait that in the consideration of what the Corps has done, the worst-case scenario? I think a great deal of weight should be placed on it. But I think that, ultimately, the Army Corps needs to determine the most likely scenario, the worst-case scenario, the best-case scenario. And it needs to require compensatory mitigation consistent with the best science and reasoning ability that it has. But even here, I'm running out of time, Your Honor. So I'm going to- Did you need to get to your third point? Yes. OK, go ahead. I'm going to go to my third point. Even here, if the Army Corps did everything it was supposed to do here on this first part, they defined it, they determined and quantified these impacts, even if they did all that stuff, they still have to then determine appropriate compensatory mitigation for the impacts that these wetlands are going to experience. And they simply did not do this here. They treated their arbitrary, temporary determination as dispositive and just said, these are temporary, so we do not need to mitigate, which is inconsistent with the test that it purports to apply here. Thank you, Your Honor. All right. Thank you. You have some time for rebuttal. Thank you. Ms. Jaffe. Good morning. Good morning. May it please the Court. Rebecca Jaffe, appearing on behalf of the United States. I'm going to take 14 minutes and interveners are going to speak for six. First, I would like to explain why the Army Corps reasonably concluded that the project design was the least environmentally damaging practicable alternative, the LEDPA. And then I will explain why the Corps' analysis of temporary impacts from pipeline construction was not arbitrary and capricious. The Corps permitted the least environmentally damaging practicable alternative for both the terminal and the pipeline. Petitioners are trying to redesign the terminal, but they ignore practicability issues with their proposals, issues that the Corps seriously considered as part of its review process. The practicability inquiry requires the Corps to consider cost, technology, logistics, and project purposes. Petitioners' proposals simply are not practicable. In terms of the terminal, the question is whether the developers could practicably use the footprint for the sixth train, which is no longer going to be built, to reduce impacts. And I think it would be helpful to look at a map. I would recommend that the Court open volume nine of the excerpts of record, page 2912. It's the same map as in Petitioner's brief, but the colors of the wetlands came across better in that version. And you can see from looking at this map the key fact, which is that there are no wetlands beneath the footprint for train six and no wetlands beneath the footprints for the adjoining trains three, four, and five. I'm sorry to interrupt you. Where did you say? I've got the record excerpts here, I think. Yes, sir. Volume nine, page 2912. Let me, that's fine. You continue. I'll look on my iPad instead. I'll get it. You said there's no wetlands beneath six. And what's the second point? No wetlands. No wetlands beneath train six, right here. Right, yeah, no. And no wetlands beneath five, four, and three. Okay, I can see that. So, and this version of the map just has more colors and it shows some wetlands here and over here. I see a sort of a wedge of wetlands here that go, that sort of bleed into some ground flares, train two, and a little bit of train one. Yes, Your Honor, exactly. And so the question is, can you shift all of that over, which would be a substantial redesign of the terminal? Shift three through five plus the ground flares over. Yes. Yes, Your Honor. And the court extensively considered that idea. They asked the developers to provide more information on this specific point. The record site for that is 2409, and the developers responded with a letter. The record site for that is 24901. And the court discussed this in its decision document. And the court reasonably concluded that it was not practicable to redesign the terminal, as petitioners suggest, because the developers showed the court that the terminal design is based on site topography, complex engineering, construction sequencing, safety, and effective emergency response time. It, for example, the terminal will begin operations while construction is ongoing. The design of the terminal ensures that while operations are happening over on this side of the terminal, you can still be constructing over here, and you won't be having any heavy machinery going through operating a terminal, which is, you simply can't move machinery of this size through an operating terminal, and it wouldn't be safe. And the court extensively considered this. And I think it's helpful to remember here that the standard isn't, if petitioners were designing the terminal from scratch, how would they do it? But was the court's decision here arbitrary and capricious? And it simply was not. They reasonably concluded that it was not practicable to redesign the terminal in this way. Mr. Gosselin, with respect to this practicability idea, talked about, and I'm going to misstate it, so forgive me, talked about staging equipment in this empty space, I guess, during the construction and drying of something that I'm not- Dredged material. Dredged material. And he disagreed with the court's views on that, with respect to practicability, to the extent I haven't mangled that. If you could respond to what he said. The court hasn't mangled it at all. So basically, if you look at the map, the developers are going to dredge over here to make room for the LNG tankers to come in and turn around, and then they're planning to take that material and dry it over here, which involves sort of spreading it out so it actually dries. And they're also planning to keep heavy equipment over here. And so petitioners are saying, well, you know that they don't need that space because they were going to build a train six there, so you just don't need that space, period. And the court's response to that is twofold. One, you still, even if you could shift everything over and you didn't need the storage space here, you still have all the safety issues and the effective emergency response time and the construction sequencing issues. That doesn't go away. So that's part one of the court's response. And part two is that the court said, there's no wetlands here. So if we're requiring this entire shift, where are they going to stage, where are they going to dry all of this material? Where are they going to stage the equipment? And the court concluded that it would cost tens of millions of dollars for the developers and that it would be approximately 254,000 dump truck trips going back and forth on local which would have traffic impacts, local infrastructure impacts, potential safety risks in terms of the roads. And the court said it's reasonable to allow the developers to use this space both because of the safety issues, the construction sequencing issues, and because of the impacts of having an off-site storage site for the millions of cubic yards of dredged material and for bringing equipment back and forth. As I understand it, under a previous version of this design, there was a train six in this empty space? Yes, Your Honor. Is that right? And I know it was redesigned and I don't remember the sequencing of it. But do you know, does it make sense even to ask when under the original design where there was a train six there in the empty space, where was the staging and the drying going to occur? So some of it was going to happen on train six until they got to the point of building that sixth train. And then it was going to happen off-site simply because there was no other option. All right. And so the empty space here now you're saying gives you that option? Yes. The empty space gives that option. And this would be a different case if there were wetlands under the train six footprint. But there simply aren't. Or next to train six. So it's also just a question of what would it take to shift everything over and is that practicable? Okay. Now, he made a separate point about the salt flats that I guess the Corps is saying, well, sure, if you moved everything west, there would be salt flats there, but they'd be impaired. Is that right? Yes, Your Honor. Okay. So if you could respond to what he's saying there. Yes. So bring back up my trusty map here. He's saying, so if you shift everything over, you'd have about five acres of wetland right here. It would still be inside a massive industrial facility, inside a levee. It wouldn't be connected to any other waters of the United States. It wouldn't be connected to any other water bodies. And so the Corps said that five acres would be so degraded and lose so much functionality because it would be sitting in the middle of a massive industrial facility that we're not getting so much gain from that. To, you know, when you weigh the other problems with shifting everything over. Okay. Can you, do you happen to know where in the record I can find the Corps' explanation of that salt flat issue? Yes, Your Honor. It would be AR 24650. Thank you. Okay. The Corps also reasonably analyzed temporary impacts from pipeline construction. And I think it's important to just step back and remember the basic point here, which is that you build a pipeline and then you revegetate it. It's not like, and it's underground. And so you can still have wetlands on top. So the question is really how long will the impacts be just while you're going through to build the pipeline? And the Corps considered all phases of construction. And you can see that at AR 24645, where it said we considered all the phases of construction. And it required best practices for all of them. The developers, for example, the Corps required special construction procedures, such as time restoring, pre-construction contours of the land, various erosion control measures. You have to use these special mats, things like that. And there's also these mandatory permit conditions. The developers have to restore each crossing within 30 days of finishing work. They have to submit post-construction monitoring reports to the question from Judge Engelhardt, what if problems arise? Well, the permit conditions give the Corps authority to say, hey, this restoration isn't working sufficiently here. You have to do more. You either have to restore more or you have to provide more compensatory mitigation or both. So the Corps contemplated there could be circumstances we're not foreseeing right now. And it retained the authority to require more. And the developers, they don't just have to submit information to the Corps about how restoration is going. They also have to submit it to FERC. And the Corps said given all of these conditions and given the year-round growing season in South Texas, which is another key piece here, this isn't a pipeline that's being built somewhere that has a long winter and snow all over the ground and things aren't growing. And you can see that point in the AR at 24647, where the Corps talked about the year-round growing season in South Texas. And the developers submitted information to the Corps showing that all the construction at each given location, so the entire pipeline, each will take 12 months to build. Each, you know, pipeline one will take 12 months. But each individual crossing within that 135-mile long pipeline will take no more than two to three months for the biggest crossings and much less for shorter crossings. And that information is at AR 25286. And the Corps said given all of these mandatory construction procedures, given the permit conditions, the pipeline construction impacts will be temporary, even with the dual pipeline construction, and compensatory mitigation is unnecessary for those impacts. And that conclusion is at AR 24647. And again, the question here isn't would petitioners have done something different? The question is was the Corps arbitrary and capricious in making the conclusion that it did? The Court should deny the petition. Thank you very much. Thank you, Counsel. Mr. Marwell. Good morning, Your Honor. May it please the Court? Jeremy Marwell for the Industry Intervenors. If I could briefly address the ripeness questions that were asked about the status of the project. And then if I might, I would talk to the terminal LEDPA arguments about the least environmentally damaging practical alternative and the compensatory mitigation. I'm happy to answer questions about the pipeline arguments that were not argued, but only if the Court has them. We believe this case is ripe. It is a final permit issued by the Army Corps. I don't believe there is any jurisdictional or prudential barrier. It is true that a big project of this sort needs multiple authorizations from various federal agencies, but that is always the case. There is a decision from the First Circuit called Weaver's Cove LNG, and I can give you a cite to that, that basically says a case can be ripe considering one permit for a project, even when there are other permits. If you had to wait for everything to be final, you would be stuck sort of in a loop, so to speak. And that Weaver's Cove cite is 589 F3D458. I don't recall whether the parties are engaging on ripeness in the briefing. No, they didn't. I was just trying to be responsible. Okay, no, no, I understand. If you would just file a 28J if that hasn't been briefed so that the other side can respond or agree with you or whatever. Of course. I think we actually agree with Petitioners that the case is ripe in this instance, but in case the Court had questions. And with regard just to the status of the project in response to Judge King's question, Rio Grande has made significant commercial progress, even since the time that the briefs were filed in this case. They have signed contracts with five additional customers. These are people who buy LNG from the terminal for 6.25 million tons per year, and it expects to sign more contracts in the next quarter. And this reflects, to some extent, current events. Is this gas going to be shipped out of the country? I mean, who are the users of this gas, finally? Yes, Your Honor. It's exported. This is a terminal for exporting gas outside of the United States. So the benefit of this from the standpoint of the United States is that we have all this gas that's available, and it's going to use this pipeline to sell to foreign customers, which means income. That is correct, Your Honor. The customers that I mentioned where contracts were signed recently are from Europe and Asia. And as you can imagine, based on current events in Europe, this is an important time for the United States to be able to supply its allies with LNG. In fact, Congress made a finding in the Natural Gas Act that the export of natural gas is affected with the public interest or in the public interest, especially for countries with which the United States has a free trade agreement. So the project is moving forward, and it is important that we have the Army Corps permit that's part of a key ability to put shovel in the ground and put steel in the ground. With regard to the terminal, certainly we agree with the government that the Corps permitted the least environmentally damaging practical alternative. The central question, which I think the Corps directly addressed, was given all the constraints involved in designing a major industrial facility of this sort, could the project be redesigned further once the sixth train was eliminated to reduce impacts on wetlands? And I think the government walked you through the various reasons why both the elimination of the sixth train, which was not in wetlands, and then the problems involved with shifting various components of the facility down. There are problems with the logistical and environmental consequences associated with all of the truck traffic needing to move things off site and then back on site. That's at AR24650-51, safety-related reasons associated with operation of the terminal and construction, AR24653, and logistical and other considerations associated with construction and sequencing. As the government explained, the plan is to build some trains, turn them on, and then continue to build so that the terminal can come online. As to the petitioner's argument that there was some inconsistency between the previously approved sixth train design, I think the key message and the thing that the Corps grappled with was the alternatives analysis and what is practicable is just different when you had a sixth train design filling up the space. You looked at the map with the government's council. It's quite a space-limited parcel, and you can see that the facilities were carefully designed to fit in the parcel. Once you eliminated a sixth train and you had space available that's not in wetlands, the practicability analysis shifted, and the regulation directs the Corps to consider cost and logistics, which it did. With regard to temporary impacts, the pipeline issue, the Corps considered all impacts, including impacts associated with pipeline construction, all phases of construction, and you can see that, among other things, because the Corps required the applicant, the pipeline, to comply as a condition in the permit with what are called the policies and procedures for construction, and those are standard practices, but they cover every stage of what's going to happen. And so I think the assertion that the Corps overlooked some portion of the facility construction sequencing is incorrect. I'm happy to answer questions. I see that I'm out of time. The Court should deny the petition for review. Thank you. Thank you. Mr. Gosselin, rebuttal. Thank you, Your Honors. The Army Corps has just conceded that under its original design that it found that staging some of the materials off-site and constructing a liquefaction train in that space is practicable. In the design where there was a train six. Exactly. Yes, Your Honor. And nothing has changed except now more wetlands can be protected by the elimination of this train six. And under, I'm going to direct the Court to Utahns for Better Transportation v. United States Department of Transportation. That's 305F3-1152, the Tenth Circuit case. Yeah, I think that's cited in the briefs. Yes. Under that case, the task of the Army Corps is to only permit the least environmentally damaging practical alternative. The Army Corps cannot reject an alternative because there are amenities or other, you know, benefits that the developers may or may not desire. But ultimately, whether those benefits exist, the question is, is the alternative, you know, will the project be capable of being done and will that project avoid the most wetlands? And here, the more wetlands would be avoided by the alternative that I discussed earlier and the Corps just conceded that it would be capable of being done because they've previously determined that it was capable of being done. Um, this is not a NEPA case. This is a case under the Administrative Procedure Act, of course. But this is not a case where the Army Corps just has to give a hard look at and analyze environmental issues. This is a case where the Army Corps needs to choose a substantive end and that end, again, is to avoid as many wetlands as practicable. The Army Corps mentioned their special construction procedures, their minimization measures in terms of compensatory mitigation and its temporariness determination. Um, the Army Corps has not determined, as we've put in our reply brief, the Army Corps has not determined the effectiveness of those procedures in terms of how effective they will be at eliminating that worst-case scenario. Um, and ultimately, the question on compensatory mitigation is not, uh, necessarily that, um, the question is even after all of those minimization procedures, even after all of the avoidance measures, the question is, after all of that, are there impacts to these wetlands? What are the consequences for those impacts to wetlands? And ultimately, what does the Army Corps have to require of the developer to offset and compensate for those losses? The minimization measures and the avoidance measures are separate, um, requirements that the Army Corps has to satisfy. There is still no, um, explanation for why the Army Corps disagrees with the EIS on the duration of impacts. When the EIS was issued, FERC and all of the cooperating agencies were aware of the location of this project in the southeast of Texas. They were aware of the fact that it does not snow there, that it has a good growing season, and even despite the fact that they were aware of all of those factors, the EIS, with all of those cooperating agencies, including the Army Corps and FERC, determined that it would take one to three years for that vegetation to regrow, despite the, um, the growing season. I will, um, end early. That's what I have for rebuttal. The Army Corps acted arbitrarily, and this Court should vacate the permit. Great. Thank you, Counsel, for a well-argued case. We'll take it under submission.